UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

GREENEVILLE DIVISION

TOBY BURRIS, et al.,                    )
                                        )
                                        )          2:20-CV-00158-CEA
            Plaintiffs,                 )
                                        )
    vs.                                 )
                                        )
CHARTER FOODS, INC., et al.,            )
                                        )
            Defendants.                 )


**REPORT AND RECOMMENDATION**

Plaintiffs have filed a Motion for Conditional Collective Action Certification [Doc. 47].

Defendants filed a Response in Opposition [Doc. 55]. Plaintiffs filed a Reply [Doc. 66] and

Defendants filed a sur-reply [Doc. 74]. This motion was referred to the undersigned for a report

and recommendation by the District Judge pursuant to 28 U.S.C. § 636(b). This matter is now ripe

for resolution. For the reasons stated below, the undersigned **RECOMMENDS** that Plaintiffs'

Motion [Doc. 47] be **DENIED**.

I.      **PROCEDURAL BACKGROUND**

On July 21, 2020, Plaintiff Toby Burris[1] filed a Complaint [Doc. 1] on behalf of himself

and similarly situated current and former employees of Defendant Charter Foods, Inc. ("Charter

Foods") and two of its associated business entities, Charter Central, LLC ("Charter Central), and

Charter Foods North, LLC ("Charter North"). The Complaint alleges collective violations of the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Pennsylvania Minimum Wage

---

[1]  Tasha Thatcher was initially also listed as a plaintiff but was later dismissed from the action by stipulation [Doc. 51].

Act of 1968, 43 P.S. §§ 333.101, *et seq.* ("PMWA"), and the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1, *et seq.* ("PWPCL").

Defendants, as Yum! Brands franchisees, own over three hundred (300) fast food restaurants and quick service industry restaurants, namely Taco Bell, Long John Silver's, KFC, A&W, and Pizza Hut restaurants across twelve (12) states, including Pennsylvania. Defendants employ approximately 7,000 workers, with 6,000 serving as Team Members and/or Shift Leads. The Complaint alleges that Defendants engaged in business practices that violated the rights of the Team Members and Shift Leads, specifically contending that Defendants failed to pay Team Members and Shift Leads appropriate overtime compensation for their work in excess of forty (40) hours per week. Plaintiffs further allege that Defendants required Team Members and Shift Leads to work off the clock before and/or after their scheduled shift to reach production quotas established by Defendants.

Plaintiffs, who were employed by Defendants as both a Team Member and Shift Lead from 2018-2019, states that Team Members and Shift Leads who are hired and compensated at an hourly rate of pay are required to clock in and clock out at the beginning and end of each shift and are "theoretically" not permitted to work off the clock. The Complaint alleges that Team Members and Shift Leads are generally scheduled to work forty (40) hours per week; however, they are routinely required and/or permitted to work off the clock before and/or after their scheduled shift. As a result, Plaintiffs claim these workers exceed their scheduled eight-hour workday, which in turn causes them to work more than forty (40) hours in a single workweek. Further, the Complaint alleges that Team Members and Shift Leads are never compensated for work performed in excess of their eight (8) hour daily shift or forty (40) hour workweek and claims states that it is common for Team Members and Shift Leads to be required to work more than twelve (12) hours in a

workday shift or sixty (60) hours each workweek without proper compensation. Additionally, Plaintiffs contend that Defendants did not accurately record all time worked by Team Members and Shift Leads by either removing hours from payroll or requiring employees to perform off the clock work in violation of the FLSA, PMWA, and PWPCL. Plaintiffs state these violations which deprived the workers of appropriate overtime compensation resulted from policies and practices common across all of Defendants' businesses with respect to Team Members and Shift Leads. Plaintiffs further assert that Defendants' failure to pay overtime compensation was due to deliberate and willful violations of the FLSA, PMWA, and PWPCL. Defendants deny all alleged violations of the FLSA, PMWA, and PWPCL. [Doc. 25].

Plaintiffs filed a Motion for Conditional Collective Action Certification [Doc. 47] on June 23, 2021, seeking the certification under § 216(b) of the FLSA and requesting authorization to send notice to other members of the collective. Plaintiffs request that the Court conditionally certify a collective action class of all individuals who are or have been employed by Defendants as Team Members and/or Shift Leads under the supervision of Michael Brungo for the three (3) immediately preceding the filing of the Complaint in this action through the date that a class is certified by the Court. Plaintiffs did not request certification of a class pursuant to Rule 23 of the Federal Rules of Civil Procedure for violations of the PMWA and the PWPCL [Doc. 47]. Defendants filed a Response in Opposition to Plaintiffs' request for conditional collective action certification. [Doc. 55]. Plaintiffs' Motion [Doc. 47] is now ripe for resolution.

## II.    CONDITIONAL CERTIFICATION AS A COLLECTIVE ACTION

### a.  Standard of Law

The FLSA empowers employees to file suit against an employer for alleged FLSA violations on their own behalf and on behalf of "other employees similarly situated." 29 U.S.C. §

216(b); *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). "Section 216(b) establishes two requirements for a representative action: 1) plaintiffs must be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Id.* (citing 29 U.S.C. § 216(b); *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 167-68 (1989)). While the FLSA does not define "similarly situated," the Sixth Circuit Court of Appeals has held that "plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009), *overruled on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Plaintiffs will also be considered similarly situated if "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.* The plaintiff bears the burden of establishing that the members of the putative class are similarly situated. *Id.*

"Courts typically use a 'two-phase inquiry' to determine 'whether proposed co-plaintiffs are, in fact, similarly situated for the purposes of the statute's requirements." *Manlove v. Volkswagen Aktiengesellschaft*, No. 1:18-cv-145, 2019 WL 7755928, at *6 (E.D. Tenn. June 11, 2019) (citing *Monroe v. FTS USA, LLC*, 860 F.3d 389, 398 (6th Cir. 2017) ). The first phase, known as the notice phase, occurs at the beginning of discovery. *Id.* The second phase takes place after notices and opt-in forms have been distributed and returned and discovery has been completed if the defendant then moves for decertification of the conditional class. *Beasley v. Over Easy Mgmt., Inc.*, No. 1:14-cv-366, 2016 WL 11503028, at *2-3 (E.D. Tenn. April 8, 2016) (citing *Comer*, 454 F.3d at 547). During the notice phase, the court determines whether conditional certification is appropriate and whether notice of the suit should be distributed to similarly situated

4

putative class members. *Id.* The plaintiff must show that "his position is similar, not identical, to the positions held by the putative class members." *Comer*, 454 F.3d at 546-47 (cleaned up). This "fairly lenient standard" is satisfied if the lead plaintiff makes a "modest factual showing that he and potential co-plaintiffs are similarly situated with respect to the conduct alleged in the complaint." *Manlove*, 2019 WL 7755928, at *6 (citing *Comer*, 454 F.3d at 547). The court does not decide substantive issues going to the merits of the case at this stage. *Id.* This lenient standard generally results in conditional certification of a representative class during the notice phase of the class certification process. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012). The purpose of conditional certification during this stage is "to provide notice to potential plaintiffs and to present them with an opportunity to opt-in." *Beasley*, 2016 WL 11503028, at *3 (quoting *Lindberg v. UHS of Lakeside*, 761 F. Supp. 2d 752, 757-58 (W.D. Tenn. 2011)).

During the second stage, following discovery, the court must more closely examine the question of whether the members of the class are similarly situated. *Comer*, 454 F.3d at 546. At that stage, "[p]laintiffs must produce more than just allegations and affidavits demonstrating similarity in order to achieve final certification." *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 671 (6th Cir. 2012). Factors considered at this stage include "the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien*, 575 F.3d at 584 (internal quotation marks omitted). In cases where the parties have conducted some, but not all, discovery, district courts within the Sixth Circuit have applied an intermediate, or hybrid, standard. *Davis v. Colonial Freight Sys., Inc.*, No. 3:16-cv-674, 2018 WL 11225871, at *3 (E.D. Tenn. March 3, 2018) (citing *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 823 (N.D. Ohio 2011)); *see also Bowman v. Crossmark, Inc.*, No. 3:09-cv-

5

16, 2010 WL 2835719, at *4-5 (E.D. Tenn. July 19, 2010) (holding that where substantial discovery had been completed the case is not in the typical "notice stage" and application of the lenient standard employed at the notice stage is not appropriate). "After some amount of discovery, the conditional certification goes 'beyond the stage one evidentiary boundaries of the complaint's allegations and supporting affidavits.'" *Davis*, No. 3:16-cv-674, 2018 WL 11225871, at *3 (citing *Creely*, 789 F. Supp. 2d at 826). Under this hybrid review, the plaintiff is required to make a "modest plus" factual showing. *Id.* Specifically, the court must determine whether the plaintiff's factual showing would "tend to make it more likely that a class of similarly situated employees exists by comparing the plaintiff's allegations in [the] complaints with the factual record assembled." *Id.* (internal quotation marks omitted). However, as the factual record has not been fully developed, the court should not consider the merits of a plaintiff's claims under this standard and should resolve any gaps or doubts in the evidence in favor of the plaintiff "in light of the equitable goals and policies embodied in the FLSA." *Creely*, 789 F. Supp. 2d at 826; *see also Davis*, No. 3:16-cv-674, 2018 WL 11225871, at *3.

In this case, the Court has determined that given the amount of discovery which has taken place, the hybrid standard of review is appropriate. Plaintiffs filed the Complaint on July 21, 2020 [Doc. 1] and a scheduling order was issued on December 8, 2020 [Doc. 33]. The Motion for Conditional Collective Action Certification [Doc. 47] was filed on June 23, 2021, nearly a year after the Complaint was filed and more than six months after a scheduling order was entered. As of July 2021, three (3) depositions had been taken by Defendants and one (1) by Plaintiffs, several declarations had been prepared and filed, and approximately 3,000 pages of documents had been produced to Plaintiffs by Defendants in response to written discovery. [Doc. 55, p. 19]. The scope of discovery that has already taken place is further evidenced by the ten (10) exhibits Plaintiffs

attached to the memorandum in support of their motion [Docs. 48, 53] and no less than eighteen (18) exhibits submitted in support of Defendants' Response in Opposition [Doc. 65], which totaled nearly 700 pages. Moreover, Plaintiffs have not asserted that Defendants have created any roadblocks in moving the discovery process forward. Taken as a whole, the Court must conclude that this matter has progressed beyond the typical notice phase, which occurs "at the beginning of discovery." *Comer*, 454 F.3d at 546. Accordingly, the Court will apply the hybrid, or "modest plus," standard in considering Plaintiff's Motion for Conditional Collective Action Certification.

In their surreply brief, Defendants assert the that the Sixth Circuit has never expressly adopted the two-step collective certification standard described above that originated in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987), but has acknowledged district courts' employment of this framework. [Doc. 74, citing *Holder v. A&L Home Care & Training Ctr., LLC*, No. 1:20-cv-757, 2021 WL 3400654, at *5 (S.D. Ohio Aug. 4, 2021)]. The propriety of this bifurcated conditional certification process was recently certified for interlocutory appeal to the Sixth Circuit by the Southern District of Ohio. *Holder*, 2021 WL 3400654, at *12. As a result, Defendants have requested that if the Court applies the lenient standard proscribed by the two-step certification process and certifies a collection that the certification opinion include language permitting interlocutory appeal pursuant to 28 U.S.C. § 1292(b). [Doc. 74, p. 3]. This is a determination properly left to the District Court and therefore will not be addressed at this juncture. *See* 28 U.S.C. § 1292(b).

### b.  Factual Background

#### i.  Depositions

*Wayne Ferguson, Charter Foods Corporate Representative*

In his deposition, Mr. Ferguson explained that Defendants' Taco Bell stores use a back-of-house computer system called e-Restaurant to manage timekeeping. [Doc. 48-2, pp. 17-20].[2] The system allows any member of management, including shift leads, area coaches, and market coaches, to modify an employee's time punches *Id.* He explained that the system automatically clocks out all employees at 4:15 a.m., so when that end time is listed for an employee, it typically indicates that the employee forgot to clock out at the end of their shift. [Doc. 48-2, p.21]. Additionally, Mr. Ferguson advised that employees are paid for breaks of less than 30 minutes and even if the employee clocks out for the break, if it is for less than 30 minutes, the system is automated so that the employee will still be paid for that time. [Doc. 48-2, p. 26/66]. Only breaks of 30 minutes or more are unpaid. *Id.* Mr. Ferguson advised that the company does not utilize a "no overtime" policy but acknowledged that the company tries to avoid overtime when possible. [Doc. 48-2, p. 74-75]. Despite these efforts, Mr. Ferguson testified that Charter Foods still pays a lot of overtime. [Doc. 48-2, p. 75]. Specifically, Mr. Ferguson noted that two of the stores within Michael Brungo's area had a total of 1,173 overtime hours. [Doc. 48-2, p. 87-89; Doc. 53-1, p. 48].[3]

---

[2]  Some documents referenced contain multiple page numbers on them. All citations to page numbers refer to the sequential page number assigned to the document by CM/ECF located at the bottom of the page in blue text.

[3]  The Court was unable to determine over what period of time this amount of overtime occurred. However, it was clear that overtime was an issue in the stores under Mr. Brungo's supervision. *See* [Doc. 48-2, p. 86; Doc. 53-1, p. 48].

8

*Deposition of Toby Burris*

Plaintiff Burris testified in depositions that he had reported being paid incorrectly to his restaurant manager and/or assistant manager but acknowledged that he had never reported it to a higher management level, to human resources, or to the payroll hotline [Doc. 48-3, p. 6-7]. He further stated that his pay was never corrected; however, he could point to no specific instance when this occurred. [Doc. 48-3, p. 7]. Plaintiff Burris went on to say that the hours he worked were recorded on register slips and those hours were not the same as the hours reflected on his paycheck. [Doc. 48-3, p. 9]. In addressing his hours worked and compensation, Plaintiff Burris testified that "I know I worked them, but [I] never got compensated for them." *Id.*

Plaintiff Burris acknowledged that he understood employees weren't supposed to work off the clock but contended that they "had to" do so. [Doc. 48-3, p. 11]. Burris stated if he ever worked off the clock it was just for 5-15 minutes, but that he knows that "some people" worked "off the clock." *Id.* He did not explain how he knew this information. Plaintiff Burris further admitted that he was never told to clock out and continue to work off the clock. [Doc. 48-3, p. 12]. He also admitted that he never witnessed a manger or shift leader instruct an employee to complete any task prior to clocking in to work. [Doc. 48-3, p. 13]. Additionally, while maintaining that there were occasions when he worked overtime and was not paid for it, Plaintiff Burris stated that he did not routinely work over 40 hours per week and was paid overtime on multiple occasions but alleged that "other people" told him they were not being paid for overtime they had worked. [Doc. 48-3, p. 14]. Further, Burris admitted he never actually saw any member of management log into the back-of-house system and adjust someone's time to remove hours. [Doc. 48-3, p. 16].

*Deposition of Susan Lewis*

Plaintiff Lewis also acknowledged that company rules prohibited employees working off the clock and that working off the clock was grounds for termination for both the employee and manager who allowed the infraction to occur. [Doc. 48-4, p. 9]. As such, she said that she knew if she was ever asked to work off the clock she should refuse. *Id.* At the same time, she said that the actual rules employees overall went by were "a different story." *Id.* Plaintiff Lewis did agree that any hours she reported as missing from her time because she was unable to clock in were addressed by her management team. [Doc. 48-4, p. 10].

While Plaintiff Lewis testified that she was not specifically instructed to clock out and keep working or start work without clocking in, she said there were times when she was asked to assist after she clocked out and she did so without clocking back in. [Doc. 48-4, p. 13]. At the same time, she agreed that no one prevented her from clocking back in. *Id.* Additionally, during her deposition Plaintiff Lewis admitted she cannot say for sure that her time was ever adjusted to remove hours that she had worked. [Doc. 48-4, p. 14].

*Deposition of Niklaus Ryker Schleufer*

Plaintiff Schleufer initially recalled reporting wage violations to Mike Brungo on at least two occasions. [Doc. 48-5, p. 7]. Later in his testimony he recalled that he only spoke directly to Mr. Brungo once about the issue and the other time it was to his store manager, John Ross, but Mr. Ross told him he would report the problem to Mr. Brungo. [Doc. 45-5, p. 13]. Plaintiff Schleufer testified that during this period he kept a planner with his college classes, appointments, and Taco Bell hours in it and stated that he showed the planner with his personal written information regarding his hours to Mr. Brungo. [Doc. 48-5, p. 9]. In addressing hours worked for which he claims he was not paid, Plaintiff Schleufer recounted a particularly long weekend during football

10

season at Penn State when he had worked well over 100 hours, but his pay stub only reflected 80 hours. [Doc. 45-5, p. 9]. He further recalled a time when he was at the College Avenue store where his hours did not match what was in the computer, and he was told the hours would be sent up the chain to be corrected. [Doc. 45-5, p. 9-10].

### ii. Time Records

*Toby Burris Time Adjustment Report*

The parties submitted time adjustment records for Plaintiffs Burris, Lewis, and Schleufer, which the Court will summarize. For Plaintiff Burris, the Court notes that there were no time adjustments from September 6, 2018, through November 20, 2018. [Doc. 53-3, p. 3-13]. For the weeks of November 28, 2018, through December 16, 2018, it appears that all of Plaintiff Burris' hours were manually added using the reason "forgot to punch in." [Doc. 53-3, p. 14-15]. There were seven instances of downward time adjustments for him from September 6, 2018, through March 13, 2019. [Doc. 53-3]. Of these, two were instances where it appears that Plaintiff Burris forgot to clock-out because the system automatically clocked him out at 4:15 a.m. and his time was later adjusted to reflect the actual end of his shift. [Doc. 53-3, p. 18, 21]. The remaining five instances together removed a total of one hour and twenty-two minutes from his time. [Doc. 53-3, p. 17, 18, 26]. This total is rather small, but the modifications on March 1, 2019, to remove a total of 21 minutes because Burris "forgot to clock out for break" and again on March 3, 2019, to remove 15 minutes for the same reason are potentially an area of concern. According to Mr. Ferguson's testimony even if an employee clocked out for a break, if the break was under 30 minutes the employee was still paid for that time, but the Court is unsure if the same was true when time was adjusted manually to deduct break time and does not understand why such an adjustment would have been necessary at all since the employee should have been paid for this time. [Doc. 53-3, p.

11

26]. If Plaintiff Burris was not paid for this break time, that would have been improper. If on the other hand, the adjustment was made merely to document the break and Plaintiff Burris lost no pay because of the adjustment, there would be no issue. The Court simply does not have sufficient information to know whether Plaintiff Burris was paid for this time. Of note, this is the only time the Court found such an issue present in the records provided.

Of note, not all adjustments to Plaintiff Burris' time reduced his hours. There are five instances where time was added. Those modifications range from an adjustment of one minute to the addition of an entire shift of 8 hours and 15 minutes [Doc. 53-3, p. 16, 17, 21, 22, 25]. Some of these modifications list the reason as "forgot to clock out" but the adjustment adds time instead of taking it away.

*Time Adjustment Records of Susan Lewis*

Plaintiff Lewis was an hourly employee from the beginning of her tenure with Defendants on October 6, 2018, through November 28, 2018. [Doc. 81, p. 1]. Her time records reflect that all time for the week of October 6, 2018, was manually entered, which the Court suspects is because she was not yet in the payroll system. [Doc. 53-5, p. 3]. Additionally, time was manually added for October 22, 2018, and the week of October 24, 2018, through October 29, 2018, with the reason being listed as "failure to clock in." [Doc. 53-5, p. 5-6].

While there is a modification on November 10, 2018, for failure to clock out for break, the adjusted time is the same as the original time, so the entry appears to have had no effect on the overall hours reported for Plaintiff Lewis. [Doc. 53-5, p. 8]. Additional modifications on November 16-18, 2018, appear to correct a failure to clock out at the end of Plaintiff Lewis' shift. For instance, with her shift that began on November 16, 2018, the system automatically clocked her out at 4:15 a.m. on November 17, 2018, which was later modified to list the time when her

shift ended. [Doc. 53-5, p. 9]. Her time was again modified on November 24, 2018, for the same reason, but then in turn, time was manually added for November 25 and 26, 2018 because Plaintiff Lewis purportedly failure to clock in. [Doc. 53-5, p. 10]. For the period that Plaintiff Lewis was an hourly employee, the Court identified no adjustments to her time records that removed time except for instances where she failed to clock out, as was evidenced by the system automatically clocking her out at 4:15 a.m. [Doc. 53-5, p. 1-10].

*Time Adjustment Report of Niklaus Schleufer*

Plaintiff Schleufer was an hourly employee from December 26, 2018, through the end of his tenure and the last adjustment to his time record was made on May 4, 2019. [Doc. 81, p. 1]. The records provided reflect only five instances where his time was adjusted downward. [Doc. 53-6, p. 14, 16, 18, 23, 29]. Of those five instances, four were required because Plaintiff Schleufer had failed to clock out and was automatically clocked out by the system at 4:15 a.m., with his time being later adjusted to reflect the actual end of his shift. [Doc. 53-6, p. 14, 16, 18, 29]. The other instance removed a total of one hour and ten minutes, with a notation stating Plaintiff Schleufer "forgot to clock out." [Doc. 53-6, p. 23].

Conversely, Plaintiff Schlefler's time was adjusted on multiple occasions to add hours. Several of these were manual time entries to add an entire shift because he apparently forgot to clock in altogether, with one of these entries being to add an eleven-hour shift. [Doc. 53-6, p. 17, 18, 22, 32]. Others were time adjustments that modified the clock in or clock out time to increase Plaintiff Schleufer's hours, despite the reason being listed as "forgot to clock out." [Doc. 53-6, p. 14] (adding 22 minutes by adjusting clock out time to a later time but using "forgot to clock out" as reason for adjustment); [Doc. 53-6, p. 22] (adding 55 minutes to total time on February 20, 2019 despite using "forgot to clock out" as the reason; adding 1 hour and 48 minutes to February 25,

2019 time by adjusting clock in time but using "forgot to clock out" as reason); [Doc. 53-6, p. 31] (adding 3 hours and 38 minutes to total time with "forgot to clock out" as reason)]. On January 6, 2019, an hour was added to Plaintiff's Schlefler's time, but that entry correctly coded the reason as "forgot to clock in." [Doc. 53-6, p. 15]. Additionally, there were time adjustment records reflecting time being manually entered to recognize that Plaintiff Schleufer had worked multiple shifts on the same date on at least two different occasions. [Doc. 53-6, p. 17, 22].

### iii. Michael Brungo's emails

Plaintiffs focus heavily on Michael Brungo's email communications regarding overtime in support of their contention that Defendants failed to pay non-exempt employees for all hours worked. Mr. Brungo served in the role of area coach over stores where Plaintiffs were employed. [Doc. 61-4, p. 19]. In a September 26, 2018, email from Mr. Brungo to several stores in his area, containing the subject line of "actual vs. allowed hours," Mr. Brungo asked one store if the new managers were punching in because they are "there to train, not for free labor." [Doc. 53-1, p. 44]. Mr. Brungo also addressed two other stores whose labor he thought was too high by telling one manager to "send people home when you are slow," and the other to "continue to work this down." *Id.*

Then, on Dec. 14, 2018, Mr. Brungo sent an email to himself detailing a meeting he had with John Ross, then a general manager at one of Defendants' Taco Bell stores, concerning his two-week notice which Mr. Ross had since expressed an interest in rescinding. [Doc. 53-1, p. 22]. This email states that "[o]ur company standard is no overtime" but Mr. Brungo goes on to say that on occasion overtime cannot be prevented. *Id.* He notes that there has been an ongoing concern at Mr. Ross' store regarding overtime, but also states that because Mr. Ross has the advantage of multiple people training "[t]here should be no OT." *Id.* Ultimately, Mr. Brugo concludes in the

email that Mr. Ross will not be permitted to rescind his notice and remain a restaurant manager because he has "failed in all measurable parameter[s] by which we measure a store's success and leadership capacity." *Id.* Mr. Brungo listed eleven areas in which he had repeatedly coached Mr. Ross with "limited to no follow through," none of which were related to overtime. [Doc. 53-1, p. 23].

On January 2, 2019, Mr. Brungo received an email from Judith Muncy, Defendants' HR PR Manager, advising him that she received a phone call from "John" claiming he is "missing a lot of hours from the last several paychecks." [Doc. 53-1, p. 16]. He then received an email from Chris Sperduto on January 25, 2019, asking why payroll is "such a big ordeal" every two weeks, to which Mr. Brungo replies: "[w]orking on; we don't want to have any more. Very frustrating." [Doc. 53-1, p. 4]. The subject line for the email was "missing hours Daniel Schleufer."[4] The missing twenty-four hours reported for Plaintiff Schleufer do appear to have been processed and paid. [Doc. 53-1, p.4-6].

Later, in a January 24, 2019, email from Mr. Brungo to Restaurant 032219 recapping a visit he made to the restaurant, he notes that labor is too high, and management should "schedule smartly and use a 7 day deployment to make sure there is the right mix of people on shift." A January 27, 2019, email from Mr. Brungo to Chris Sperduto, one of Defendants' directors of operations and Mr. Brungo's immediate supervisor, and to the manager at the Hills Plaza Taco Bell store notes that the store was initially seventy hours over its labor budget, but Mr. Brungo says he "found" fifty-four hours, which he instructed the store manager to adjust in the system. 53-1, p. 3. Mr. Brungo pointed out that even after the adjustment, the store was still 16 hours over its labor budget and "people should have been sent home early." He further states that if sales are

---

[4] Daniel Schleufer refers to opt-in plaintiff Niklaus Schleufer, who went by Daniel at the time.

falling as much as it appears then further cuts would need to be made to the schedule but implies that employees could go help out at another store that is short-staffed if they need hours. *Id.*

### iv.  Company Policies

*FLSA Violating Policy*

To meet the threshold for FLSA conditional certification, Plaintiffs bear the burden of establishing that Defendants utilized an FLSA-violating policy. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009). Here, Plaintiffs allege Defendants "enforced a strict policy against the use and payment of overtime among front-line hourly employees," which resulted in employees being required to work "off the clock" or having their time manually adjusted by managers to avoid the payment of overtime. [Doc. 47, p. 1; Doc. 48, p. 1]. Defendants contend that they did not have such a policy and that their written policies demonstrate their policy is to pay non-exempt employees for all hours worked. They point to the Charter Foods Employment Handbook which lists falsification of time keeping records as unacceptable conduct [Doc. 65-9, p. 12]. They also point to the payroll section, which details requirements for employees addressing clocking in and out at the beginning of each shift or meal period and advises employees of their responsibility for verifying their actual hours worked. The handbook further states that all hours worked over 40 in a workweek must be paid overtime. [Doc. 65-9, p. 20]. Working off the clock is listed as a "critical violation" and is grounds for immediate termination for both the employee and the acting management who permitted it. *Id.*

### c.  Legal Analysis

Plaintiffs argue that they and the members of the proposed collective are similarly situated because they all suffered from a single FLSA-violating policy utilized by Defendants, which was requiring and/or encouraging employees to work off the clock and improperly editing time sheets

16

to avoid paying overtime. [Doc. 48, p. 11]. Defendants respond by arguing Plaintiffs have not shown that they or other members of the putative collective have been subjected to an FLSA-violating policy or plan. [Doc. 55, p. 19]. Additionally, Defendants argue that Plaintiffs have failed both to show they are similarly situated because they have not provided any evidence of a widespread discriminatory plan and that a manageable class exists. [Doc. 55, p. 22].

In support of their position, Plaintiffs note that district courts within this circuit "have frequently granted conditional certification in cases alleging editing of time records by management and off the clock work, even when there are significant differences between the employees within the putative collective." [Doc. 48, p. 6]. Plaintiffs point to *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3-4 (M.D. Tenn. Sept. 26, 2006) as one such example. In *Wilks*, the plaintiffs alleged they were deprived of overtime compensation through four allegedly unlawful nationwide practices, including requiring employees to work off the clock and "shaving" time from payroll records. 2006 WL 2821700, at *1. After conducting an extensive review of a substantial amount of admissible evidence submitted in the case, the *Wilks* court founds the plaintiffs had presented "significant evidence that they were subjected to a common, improper practice [and] the variations in their factual and employment settings [did] not render collective treatment inappropriate." *Id.* at *3.[5] In doing so, the *Wilks* court noted that determining whether plaintiffs were impacted by a "single decision, policy, or plan" is often an important factor in determining whether collective treatment is appropriate. *Id.* The court in *Wilks* acknowledged that although there does not appear to be any controlling precedent on the issue in this circuit, some courts have found that plaintiffs must meet a relatively stringent evidentiary standard in

---

[5] While the Court finds *Wilks* instructive in this instance, it should be noted that the analysis in *Wilks* was undertaken upon the defendant's motion for decertification of the conditionally certified collective. 2006 WL 2821700, at *1-2.

17

demonstrating the existence of an alleged policy or practice to which they were all subjected. *Id.* at \*4 (citing *Hill v. Muscogee Cty. Sch. Dist.*, No. 4:03-cv-60, 2005 WL 3526669, at \*2 (M.D. Ga. Dec. 20, 2005)). Ultimately, the *Wilks* court determined the plaintiffs had submitted a substantial amount of evidence to support their contention that they were subjected to improper timekeeping and overtime practices, which was summarized in the court's opinion. *Id.*

As in *Wilks*, this Court has thoroughly reviewed the pleadings and exhibits submitted by the parties in this case, which are substantial. But unlike in *Wilks*, Plaintiffs in this case have not demonstrated that they were subjected to a common policy or plan. While the "[d]enial of a motion for conditional certification is uncommon, … the very existence of a two-step process implies that a rare case will not pass the lenient requirements of the initial notice stage." *Penarouque v. Century Park Assoc., LLC*, No. 1:18-cv-122, 2019 WL 11271273, at \*3 (E.D. Tenn. Jan. 31, 2019). In *Penarouque*, the plaintiff moved for conditional certification of a collective pursuant to the FLSA alleging she and other Business Office Managers employed by the defendant regularly worked more than 50 hours in a workweek without receiving overtime pay. *Id.* at \* 2. The motion was supported by two job description documents for the Business Office Manger position and the plaintiff's earnings statements for various pay periods. *Id.* The *Penarouque* court determined that the plaintiff had failed to establish that a class of similarly situated plaintiffs existed because, among other reasons, she "offered no evidence to indicate the existence of a plan or policy of FLSA-violating behavior." *Id.*

While the record here is not as barebones as the one in *Penarouque*, the evidence submitted by Plaintiffs simply does not bear out their accusations. Although Defendants have not submitted countervailing proof, most of the proof submitted by Plaintiffs is contradictory to their assertions. Plaintiffs assert that employees were, at a minimum, encouraged to work off the clock and, at most,

were required to do so. They further contend that employees' time records were being modified to remove hours so Defendants could avoid paying overtime. Unfortunately for Plaintiffs, the deposition testimony does not support the existence of the alleged FLSA-violating policy nor do the time adjustment records provided support the allegations. For example, in addressing working off the clock, Plaintiff Burress admitted that he was never instructed to do so and if he ever did work off the clock, it was only for 5-15 minutes. [Doc. 48-3, p. 11]. Further, Plaintiff Burress' deposition testimony indicates that there was significant rumor and innuendo among employees about not being paid for all the hours they worked, but the evidence of record does not support these contentions. *See* [Doc. 48-3, p. 11, 14]. Plaintiff Schleufer also stated other employees had not been paid properly but did not provide any details. [Doc. 48-5, p. 17]. Likewise, neither Plaintiff Lewis nor Schleufer testified they were ever *required* to work off the clock. *See* [Doc. 48-4, 48-5]. In summary, Plaintiffs' deposition testimony failed to demonstrate that they were forced or permitted to work off the clock with management knowledge nor were they able to provide any concrete examples of their time being modified to allow Defendants to avoid paying overtime.

Similarly, the time adjustment records submitted by Plaintiffs do not support their contention of a policy or practice of manually reducing employees' worked hours to prevent the payment of overtime. As detailed above, many of the instances of time being adjusted served to *add* hours to the employees' time, which would directly contradict an effort to lower hours to avoid paying overtime. *See* [Doc. 53-3, p. 16, 17, 21, 22, 25; Doc. 53-6, p. 17, 18, 22, 32]. Additionally, there is no evidence to show that an employee's time can be adjusted without that modification being reflected on the time record in the system. While the records submitted do contain limited adjustments that reduce employees' hours, the reductions appear to be reasonable based upon the

reason given for the adjustment and the overall amount of time removed, and the records do not reflect adjustments that support employees' time being modified to any significant degree.

Plaintiffs rely heavily upon statements included in emails sent by Michael Brungo to establish the existence of a "no overtime" policy in violation of the FLSA. However, when those emails are read in context, they do not support Plaintiffs' claim. Conversely, the emails acknowledge that the payment of overtime is sometimes unavoidable and in one instance detail a significant amount of overtime hours in the stores under Mr. Brungo's supervision. [Doc. 53-1, p. 22, 48].[6] To be fair to Plaintiffs, had the testimony from Plaintiffs been stronger as to Defendants' alleged time-shaving practices or had the time adjustment records contained information consistent with Plaintiffs' claims, it would be possible to read Mr. Brungo's emails in a different light. Under the circumstances at hand, however, they simply do not bear out Plaintiffs' claims of an FLSA-violating policy.

Finally, Defendants had written policies in place, of which Plaintiffs were aware, that clearly stated employees should not work off the clock and employees were to be paid overtime for all hours over 40 worked in a single workweek. Of course, the existence of appropriate written policies does not end the inquiry because companies would be expected to have written pay policies that comply with the law, which is especially true with companies the size of Defendants in this matter. *See Wilks*, 2006 WL 2821700, at *5 (Finding that the defendants had provided proof of written policies prohibiting the very impermissible timekeeping and overtime practices about which the plaintiffs were complaining but noting that the mere existence of such policies is not enough). At the same time, the Court cannot ignore the existence of these policies where the record

---

[6] This email also demonstrates overtime was being paid in stores under the supervision of other area coaches as well.

does not support a conclusion that there were widespread violations of them and there is no evidence that an alternate, FLSA-violating policy was utilized.

To meet the threshold for FLSA conditional certification, Plaintiffs bear the burden of establishing that Defendants utilized an FLSA-violating policy. *O'Brien*, 575 F.3d at 585. Because Plaintiffs have failed to demonstrate the existence of such a policy, they have necessarily failed to show that they and members of the proposed collective are similarly situated.

### III.    CONCLUSION[7]

For the reasons set forth above, the Court **RECOMMENDS** that Plaintiffs' Motion for Conditional Collective Action Certification [Doc. 47] be **DENIED**.

Respectfully Submitted,

/s Cynthia Richardson Wyrick
United States Magistrate Judge

---

[7] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).